**Andrew ARONSON, Plaintiff,**

v.

**McKESSON HBOC, INC., et al., Defendants.**

**No. C 99–20743 RMW.**

United States District Court, N.D. California.

Nov. 2, 1999.

**210.** Docket 23, at 49.

Stephen R. Basser, Barrack Rodos & Bacine, San Diego, CA, Max W. Berger, Daniel L. Berger, Bernstein Litowitz Berger & Grossman, New York City, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Barrack Rodos & Bacine, Philadelphia, PA, Stanley Grossman, D. Brian Hufford, Pomerantz Levy Haudek Block & Grissman, New York City, Joseph J. Tabacco, Jr., Berman DeValerio Pease & Tabacco, San Francisco, CA, for Andrew Aronson, plaintiff. ·

Mark C. Gardy, Nancy Kaboolian, James S. Notis, Abbey Gardy & Squitieri LLP, New York City, James J. Seirmarco, Abbey Gardy & Squitieri, LLP, San Francisco, CA, for HBO & Co. Securities Act Group, defendant.

Stephen R. Basser, Barrack Rodos & Bacine, San Diego, CA, Max W. Berger, Daniel L. Berger, Rochelle Feder Hansen, Thomas E. Chase, Bernstein Litowitz Berger & Grossman, New York City, Leonard Barrack, Gerald J. Rodos, M. Richard Komins, Barrack Rodos & Bacine, Philadelphia, PA, for New York State Pension Fund Group, plaintiff.

Daniel C. Girard, Robert S. Green, Robert A. Jigarjian, Girard & Greene LLP, San Francisco, CA, for Richard A. Cohen, plaintiff.

Edward S. Zusman, Ronald S. Kravitz, Zelle Hofmann Voelbal & Gette LLP, San Francisco, CA, Kevin P. Urbatsch, San Francisco, CA, Peter S. Myers, Myers Law Firm, San Francisco, CA, for Christine Chang, Jack Cooper Investment Corp., plaintiffs.

Gary M. Elden, Eric D. Brandfonbrener, Grippo & Elden, Chicago, IL, Lawrence A. Callaghan, Donald J. Querio, Severson & Werson, San Francisco, CA, for Charles

M. Jacobs, Josephine A. Lamprey, Henry F. Nelson, Randolph W. Seed, plaintiffs.

Francis M. Gregorek, Betsy C. Manifold, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA, Wallace A. Showman, Law offices of Wallace A. Showman, New York City, for Marvin Barb, plaintiff.

Alan Shulman, Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Richard S.E. Johns, Kipperman & Johns, San Francisco, CA, Daniel L. Berger, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA, for John J. Foley, Michelle B. Foley, plaintiffs.

Paul F. Bennett, Solomon B. Cera, Gold Bennett Cera & Sidener LLP, San Francisco, CA, for Cherie Mohrfeld, plaintiff.

Tomothy A. Miller, James E. Lyons, Jonathan J. Lerner, Skadden Arps Slate Meagher & Flom, San Francisco, CA, Jonathan J. Lerner, Skadden Arps Slate Meagher & Flom, New York City, for McKesson HBOC, Inc., defendant.

David Hennes, Mark J. Stein, Eric A. Hirsch, Fried Frank Harris Shriver & Jacobson, New York City, Kevin J. Yourman, James E. Tullman, Behram V. Parekh, Weiss & Yourman, Los Angeles, CA, for Mark A. Pulido, defendant.

Moses Silverman, Thomas Gentile, Karen S. Kennedy, Paul Weiss Rifkind Wharton & Garrison, New York City, Kevin J. Yourman, James E. Tullman, Behram V. Parekh, Weiss & Yourman, Los Angeles, CA, for Charles W. McCall.

James Goldberg, Samuel R. Miller, Folger Levin & Kahn LLP, San Francisco, CA, for Alfred C. Eckert, Philip A. Incarnati, Alton F. Irby, III, M. Christine Jacobs, James V. Napier, Gerald E. Mayo, Donald C. Wegmiller, Jay P. Gilbertson, defendants.

Charles K. Verhoeven, Quinn Emanuel Urquhart Oliver & Hedges LLP, Palo Alto, CA, for Salomon Smith Barney, defendant.

Paul F. Bennett, Joseph M. Barton, Gold Bennett Cera & Sidener LLP, San Francisco, CA, for Stephen G. Sullivan, movant.

Samuel Sporn, Schoengold & Sporn, New York City, Kevin J. Yourman, Joseph H. Weiss, Weiss & Yourman, New York City, for McKession Nationwide Group, movant.

Stacey L. Mills, Samuel D. Heins, Bryan L. Crawford, Heins Mills & Olson, P.L.C., Minneapolis, MN, Joseph J. Tabacco, Jr. Christopher T. Heffelfinger, Jennifer S. Abrams, Berman DeValerio Pease & Tabacco, San Francisco, CA, Gregory D. Phillips, Kevin A. Howard, Haward Phillips & Andersen, Salt Lake City, for Utah State Retirement Bd., movant.

Neil L. Selinger, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, Richard M. Heimann, James M. Finberg, Melanie M. Piech, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, CA, for New York City Pension Funds, movant.

Roland C. Colton, Grant Puleo, Matthew D. Rifat, Colton & Roesser, Del Mar, CA, William M. Audet, Ryan M. Hagan, Alexander Hawes & Audet, San Jose, CA, for UHL Access Plaintiff's Group, movant.

Michael J. Freed, Edith F. Canter, Much Shelist Freed Denenberg Ament & Eiger PC, Chicago, IL, Reed R. Kathrein, William S. Lerach, John K. Grant, Christopher P. Seefer, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, for Rappaport Group, movant.

Daniel C. Girard, Robert S. Green, Robert A. Jigarjian, Girard & Greene LLP, San Francisco, CA, for Senvest Intern. LLC, Senvest Master Fund L.P., movants.

Martin D. Chitwood, Neal S. Berinhout, Chitwood & Harley, Atlanta, GA, Francis M. Gregorek, Betsy C. Manifold, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA, for Kentucky Teachers' Group, movant.

Frederic S. Fox, Robert N. Kaplan, Janine R. Azriliant, Kaplan Kilsheimer & Fox LLP, New York City, Francis M. Gregorek, Betsy C. Manifold, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA, for McKesson HBOC Group, movant.

Gerald J. Rodos, Barrack Rodos & Bacine, Philadelphia, PA, Steven E. Cauley, Scott E. Poynter, Gina M. Cothern, Brian Robbins, Steven E. Cauley P.A., Little Rock, AR, Robert Scott Dreher, John W. Jeffrey, Matthew R. Miller, Jeffrey & Miller, San Diego, CA, for James Flanigan, movant.

## ORDER

WHYTE, District Judge.

The court heard several motions to consolidate, appoint lead plaintiff, and approve selection of lead counsel in this securities class action on October 29, 1999. The court has read the moving and responding papers [1] and heard the argument of counsel. For the reasons set forth below, the court grants the motion to consolidate all actions except *Cohen*, and defers consideration of the lead plaintiff and lead counsel motions until it has received further submissions from the New York City Pension Funds and the New York State Common Retirement Fund.

## I. BACKGROUND

Presently before the court are at least fifty-four related class action complaints against McKesson HBOC, Inc. (McKesson), and various of its executives. Plaintiffs in twelve of these suits now move to consolidate the actions (though they disagree on the extent of consolidation), and each of these twelve plaintiffs (most of whom are actually plaintiff "groups") moves to be appointed lead plaintiff—and, of course, to have its counsel appointed lead counsel.

---

**1.** The court has not reviewed the materials filed with the New York City Pension Funds' *ex parte* motion to file its fee agreement with counsel under seal.

This litigation began with a press release that McKesson issued shortly before markets opened on April 28, 1999. The press release announced that McKesson would have to restate its earnings for the past year, because one of McKesson's predecessor corporations, HBOC, Inc., had "improperly recognized" almost forty million dollars in software transactions as sales not subject to contingencies. Almost immediately afterwards, McKesson stock, which had traded as high as $89.75 per share on the New York Stock Exchange, lost more than half of its value, trading for as little as $32 per share.

Given the rather startling admissions in McKesson's press release—and the sharp drop in trading value that ensued—securities class actions were probably inevitable. The court is presently aware of at least fifty-four complaints, all of which have been deemed related cases and assigned to the court by the District Reassignment Committee.

## II. ANALYSIS

A. Consolidation Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure

Rule 42(a) grants the court discretion to consolidate "actions involving a common question of law or fact." It seems obvious that fifty-four separate class actions predicated on the same set of misstatements by corporate officials, causing an artificial inflation and then a corrective drop in share prices, present common questions of fact. Indeed, no movant appears to contest that there are many common questions of fact among the various complaints. Some movants nevertheless argue for separation of their claims. Several of these movants argue that their claims are so distinct— whether because of the legal theory pursued, or the type of security involved— that consolidation would be ill advised. Another movant argues (with support from defendants) that even if all other claims

are consolidated, his common-law shareholders' derivative claim should be kept separate.

1. *The "Niche" Federal Securities Claims*

■ Many movants allege claims against McKesson based on a variety of federal securities claims other than Rule 10b–5, or for transactions involving securities other than common stock. These plaintiffs move to be appointed lead plaintiffs for their "niche" actions, claiming that their causes of action are so distinct as to justify appointment of multiple lead plaintiffs. For instance, two competing groups, the McKesson Proxy Group and the Rappaport Group claim that they should represent all § 14(a) claims against McKesson. Yet another two movants, Stephen G. Sullivan and the HBOC Securities Act Group are vying for the right to pursue claims under the Securities Act of 1933 (as opposed to claims under the Securities Exchange Act of 1934). Movant Jim Flanigan, for his part, seeks to create a subclass of options purchasers.

The "niche" plaintiffs first argue that a separate lead plaintiff should be appointed because there may be different defendants for their claims, and these defendants' interests may conflict with those of an omnibus lead plaintiff. For instance, the Rappaport Group alleges that it may have claims against its members' financial advisors. *See* Motion of Rappaport Plaintiffs For Appointment of Lead Counsel at 9:6–8. It argues that the McKesson purchaser classes have not alleged any claims against their financial advisors and accounting firms.[2] Accordingly, it contends that the McKesson purchaser class will not vigorously pursue these defendants. The only case that adopted plaintiffs' theory involved an actual conflict of interest: a proposed lead plaintiff held over $300 million in investments with a defendant bro-

---

**2.** Notably, the Rappaport plaintiffs have not alleged any claims against their financial ad-

visors either.

kerage firm. *See In re Cendant,* 182 F.R.D. 144, 149 (D.N.J.1998). No such conflict is even alleged here.

The "niche" movants also argue that they may be entitled to separate remedies. For example, the § 14(a) movants claim that they may be entitled to a remedy of rescission and that a lead plaintiff whose damages primarily resulted from open-market purchases of McKesson stock would not vigorously pursue such a remedy. Even allowing for the possibility of rescission (which appears unlikely, because the McKesson/HBOC merger is complete), "[i]t is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages." *Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir.1975). The fact that the court's decision on damages may speculatively create a future conflict does not render the choice of lead plaintiff inappropriate. *See id.* (trial court did not err in certifying one class in securities class action despite potential future conflict as to damages).

Finally, the "niche" plaintiffs claim prejudice because their theories of recovery involve different showings of scienter and proof. However, as all claims are based on the same financial disclosures, the existence of different pleading standards does not create the need for a separate lead plaintiff. The Reform Act requires only that the interests of the class members be adequately represented by the lead plaintiff. *See* 15 U.S.C.A. § 77z–1(a)(3)(B)(I)

(West 1997). There is no bar to one plaintiff alleging multiple theories of recovery. *See* Fed. R. Civ. Proc. 8(e)(2). Although each plaintiff undoubtedly has an interest in securing an outcome most favorable to its position, "every warrior in this battle cannot be a general." *In re Cendant,* 182 F.R.D. 144, 148 (D.N.J.1998).

The "niche" plaintiffs' arguments do not fully take into account that the Reform Act establishes a procedure for the court's speedy consolidation of all pending claims. Under the Act, a member of the purported plaintiff class who wishes to challenge the appointment of a presumptively most adequate plaintiff must present proof that the presumptively most adequate plaintiff either (i) will not fairly and adequately protect the interests of the class or (ii) is subject to unique defenses that render that plaintiff incapable of adequately representing the class.[3] *See* 15 U.S.C.A. § 78u–4(a)(3)(B)(iii)(II) (West 1997). The "niche" plaintiffs have not met their statutory burden. Their speculations about possible conflicts do not rebut the statutory presumption that one lead plaintiff can vigorously pursue *all* available causes of action against *all* possible defendants under *all* available legal theories.[4]

### 2. *The Cohen Derivative Suit*

Plaintiff Richard Cohen's objection to consolidating his common-law derivative suit against McKesson deserves to be addressed separately. Essentially, Cohen

---

**3.** Movant Flanigan argues that options traders should have their own lead plaintiff, because they may conceivably be subject to a standing defense. This is a non sequitur. The appropriate inquiry is whether the lead plaintiff for the class is subject to unique defenses, not whether class members with unique defenses require separate leadership. *See* 15 U.S.C.A. § 78u–4 (a)(3)(B)(iii)(II)(bb) (West 1999). Moreover, Flanigan mischaracterizes *Chill v. Green Tree Financial,* 181 F.R.D. 398 (D.Minn.1998) to buttress his position; the District of Minnesota is located in the Eighth Circuit, not the Third Circuit, *see* 28 U.S.C. § 41 (1994), and is indeed bound by the Eighth Circuit's restrictive precedent on option-holder standing, which was one reason

for that court's decision to create a separate options class. In any event, at least one case from this District has already taken a much broader view of option-holder standing. *See In re Adobe Systems, Inc. Securities Litigation,* 139 F.R.D. 150, 155 (N.D.Cal.1991) (holding that options traders may assert Rule 10b–5 claims.)

**4.** This determination in no way precludes the "niche" plaintiffs from raising the same issues during the Rule 23 class certification process, where their concerns are much more germane. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *Amchem Prods. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

argues that his common-law derivative claim should not be consolidated with all the other complaints, because his claim seeks recovery on behalf of McKesson, a conflict with the other complaints, which seek recovery *from* McKesson. Cohen cites the case of *Hawk Industries, Inc. v. Bausch & Lomb, Inc.,* 59 F.R.D. 619, 623–24 (S.D.N.Y.1973), which appears to support this proposition. Also, defendants, who otherwise support total consolidation of the various McKesson suits, have expressed their willingness to keep the *Cohen* action separate, at least for some purposes.

However, Cohen's argument should be fully briefed by the parties before the court rules on consolidation of his suit. Cohen's two-page "Response" only raises his argument in a rudimentary fashion, and none of the other plaintiff movants have had a meaningful opportunity to review these papers.[5] The court therefore defers consideration of Cohen's motion until it has heard the views of all the parties.

B. APPOINTMENT OF LEAD PLAINTIFF PURSUANT TO SECTION 21D OF THE SECURITIES EXCHANGE ACT

The competing motions before the court raise many of the same issues that have vexed district courts (including this court) in selecting an appropriate lead plaintiff under the Reform Act. In particular, movants raise familiar issues relating to the propriety of aggregating various individuals into plaintiff "groups," or even of appointing multiple "co-lead plaintiffs" (each of whom may be a plaintiff group). Movants also dispute whether one of their number is a "professional plaintiff," and whether that movant has complied with the statutory certification requirements. On the other hand, at least one issue appears to be one of first impression: how a court should resolve competing claims by movants that they have "the greatest financial interest" in the litigation.

1. *Appropriateness of Group Plaintiffs*

█ The first issue is whether the losses of individual plaintiffs may be aggregated into group losses to create a lead plaintiff group with the "greatest financial interest" in the litigation. It is impossible to resolve this issue without colliding into the widely divergent decisions reached by other courts (and even by courts in this District), all of which, it seems, the parties have managed to dig up and cite to the court, whether published or unpublished, available on-line or not.

Virtually every court construing Section 21D has turned to the legislative history of the Reform Act to determine whether plaintiffs may be aggregated to determine who has the "greatest financial interest."[6] The essential motivation behind Section 21D's lead plaintiff provisions, which movants do not dispute, "was to prevent lawyer-driven litigation." *In re Donnkenny Inc. Securities Litigation,* 171 F.R.D. 156, 157 (S.D.N.Y.1997). The framers of the Reform Act envisioned that established institutional investors would take control of securities litigation, taking it away from "figurehead plaintiffs who exercise no meaningful supervision of litigation." *Ravens v. Iftikar,* 174 F.R.D. 651, 661 (N.D.Cal.1997). In economic terms, the goal of the statute is to reduce the "collective action" problems that widely dispersed clients face in supervising their attorneys. To that end, it makes sense that one client will provide more control than a disjointed group concocted by plaintiffs' counsel—

---

**5.** Defendants' views are known to the court only because they filed papers less than 14 days before the hearing dates, a practice not authorized by the Local Rules.

**6.** The Reform Act itself contains no legislative findings. *See* Pub.L. No. 104–67, 109 Stat. 737 (1995). The most authoritative source of legislative history for the Reform Act is the House Conference Report, H.R. Conf. Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679. *See In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 977 (9th Cir.1999) (commending Conference Report as "most reliable evidence of congressional intent").

even if the group consists of institutional investors.

In any event, the real issue is not whether Congress meant to authorize the aggregation of unrelated plaintiffs when it passed the Reform Act. It almost certainly did not. The issue is whether the enacted language of the Reform Act allows such aggregation. Section 21D(a)(3)(B)(i) provides that the court shall consider lead plaintiff motions from any

> purported class member ... including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff *the member or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

15 U.S.C.A. § 78u–4(a)(3)(B)(i) (West 1997) (emphasis added). Further on, in establishing the criteria for determining the "most adequate plaintiff," the Reform Act refers to "the person *or group of persons*" that meet those criteria. *Id.* § 78u–4(a)(3)(B)(iii)(I) (emphasis added).

These references to "members" and "group of persons" in the statute have given rise to a number of differing interpretations of the Reform Act's lead plaintiff provisions.

One plausible reading is that Congress failed to legislate what it meant, and that any conglomeration will do.[7] Many courts have adopted such an approach, which has considerable merit as a literal reading of the statute.[8] The disadvantage, of course, is that plaintiff's counsel captures control of the process by assembling groups of litigants that will find it difficult to coordinate their supervision of the representation: this is precisely the evil that Congress sought to eliminate.

Another approach, described as a "middle course" by another court in this District, is to allow aggregation, but only when it is necessary to address the existence of intra-class periods, or if it would guarantee effective control of counsel. *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 585–86 (N.D.Cal.1999). While the *Wenderhold* approach is eminently sensible, its categorical exceptions approach is not expressly set forth in the text of the statute. Interestingly, on the facts before it, the *Wenderhold* court appointed a single individual investor as lead plaintiff (although the court took an active role in ensuring that plaintiff's counsel was selected with the best interests of the class in mind).

The strictest approach forbids aggregation of unrelated plaintiffs, and interprets the term "group" narrowly as a small number of members that share such an identity of characteristics, distinct from those of almost all other class members, that they can almost be seen as being the same person. This was the approach adopted by the court in *In re Telxon Corp. Securities Litigation*, 67 F.Supp.2d 803, 809–13 (N.D.Ohio 1999), which contrasted a "group" with a "melange of unrelated persons." Under this definition, a "group" has a meaningful relationship preceding the litigation, and is united by more than the mere happenstance of having bought the same securities. The classic example

---

**7.** It cannot seriously be contended that several of the movant groups have anything in common other than their counsel or an interest—shared with all class members—in seeing that McKesson and its officers are held liable.

**8.** If only published opinions are taken into account, the following decisions have allowed aggregation of unrelated plaintiffs into plaintiff groups, with or without discussion: *In re Olsten* Corp., 3 F.Supp.2d 286 (E.D.N.Y. 1998); *Switzenbaum v. Orbital,* 187 F.R.D. 246 (E.D.Va.1999); *In re Milestone Scientific,* 183 F.R.D. 404 (D.N.J.1998); *In re Cendant,* 182 F.R.D. 144 (D.N.J.1998); *In re Oxford Health Plans, Inc.,* 182 F.R.D. 42 (S.D.N.Y. 1998); *Chill v. Green Tree Financial,* 181 F.R.D. 398 (D.Minn.1998); *Gluck v. CellStar,* 976 F.Supp. 542 (N.D.Tex.1997); *In re Donnkenny Inc. Sec. Litig.,* 171 F.R.D. 156 (S.D.N.Y.1997); *Greebel v. FTP Software, Inc.,* 939 F.Supp. 57 (D.Mass.1996).

of such a group would be a partnership, which has no separate legal identity, but shares in both assets and liabilities. Other such groups might be the various subsidiaries of a corporation, or members of a family.

The court adopts this narrow view of the "group" and "plaintiffs" language in Section 21D. First, as the *Telxon* court noted, this view comports with several dictionary definitions of "group," such as "a relatively small number of individuals assembled or standing together; ... compare CROWD" (Webster's Third, 1986), or "a number of individuals assembled together or having some unifying relationship" (Merriam Webster's Collegiate, 10th ed.1994). Second, this reading is consistent with the legislative intent to increase client control over plaintiff's counsel, and to the extent the statutory language is ambiguous, its drafters' intent is an appropriate interpretive tool.

The court is aware that its unpublished opinion in *In re Read–Rite Corp. Securities Litigation*, C–97–20059 RMW (N.D.Cal. May 27, 1997) may suggest a different result. In *Read–Rite,* this court appointed a plaintiff "group" as lead plaintiff in a consolidated securities class action. In that case, however, there were no competing movants for lead plaintiff. The only opposition to the proposed plaintiff group came from the defendant. *Id.,* slip op. at 4 ("Here, none of the purported class members is challenging the Proposed Lead Plaintiffs' right to serve as lead plaintiff or the choice of lead counsel.") The court is therefore not troubled by the differing result here, where groups as large as 4,000 plaintiffs strong are vying for appointment.

It should be clear that this narrow construction of "group of persons" definitively forecloses appointment of multiple plaintiffs (or plaintiff "groups") to serve as "co-lead" plaintiffs. This would simply effect an end-run around the Reform Act. Indeed, whatever the evils of agglomerated "group" plaintiffs, they theoretically demonstrated their ability to speak with one voice when they combined to work with one lawyer. (This, of course, assumes that the members of the group themselves initiated the representation, rather than the other way around.) Even courts that have allowed "group" plaintiffs have usually disallowed "co-lead" plaintiffs. *But see In re Oxford Health Plans, Inc., Securities Litigation,* 182 F.R.D. 42 (S.D.N.Y.1998) (rejecting *amicus* view of SEC and appointing co-lead plaintiffs). The court therefore declines to appoint more than one lead plaintiff.

Having concluded that the lead plaintiff must be an individual person or entity, or at most, a close-knit "group of persons," the court will construe the various group motions as alternatively moving to appoint each group's member with the greatest financial stake in the litigation the lead plaintiff.

### 2. *Florida's Eligibility to Serve as a Lead Plaintiff*

■ The individual movant with the greatest apparent loss is the Florida State Board of Administration ("Florida"), with claimed losses exceeding $180 million. Several other movants, clearly anticipating this outcome, object that Florida is a presumptively barred "professional plaintiff" for purposes of the Reform Act (because it has filed more than five securities class actions in the last three years), that it has not rebutted this presumptive bar, and that Florida failed to file the appropriate statutory certification identifying all securities class actions in which it had sought to serve as class representative. The certification requirement cannot be waived, so the court addresses it first.

#### a. *The Certification Requirement of Section 21D(a)(2)(A)*

Florida did not file a complaint, nor has it filed a certification pursuant to Section 21D(a)(2)(A). That Section provides:

> Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which

shall be personally signed by such plaintiff and filed with the complaint, that—

. . . . .

(v) identifies any other action under this chapter, filed during the 3–year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class

. . .

15 U.S.C.A. § 78u–4(a)(2)(A) & (A)(v) (West 1997).

■ Florida gives two reasons for not filing a certification: (1) the certification requirement applies only to those members of the plaintiff class who file complaints; and (2) the Local Rules excuse non-complaining movants from filing statutory certifications.

Florida argues that the language of the certification provision refers only to those who file complaints, and that this precludes the court from requiring certification from those who do not file complaints. In *Greebel v. FTP Software, Inc.,* 939 F.Supp. 57 (D.Mass.1996), which Florida cites, the court adopted this interpretation of the certification requirement. The *Greebel* court held that the statute should be read to give each word effect, and that the words "filed with the complaint" are words of limitation. The court also cited to the legislative history of the certification provision, including the Senate Committee and Conference Committee Reports, which both state that non-complaining members would not have to file certifications as part of the motion.

Another court reached precisely the opposite result, holding that the Reform Act requires non-complaining movants to file certifications contemporaneously with their lead plaintiff motions. In *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398 (D.Minn.1998), a dispute arose among the movants regarding the adequacy of certifications that one non-complaining movant group had filed. The group in question declared that its certifications were more than adequate, because they were not even

required to file certifications. The *Chill* court flatly rejected the argument, stating:

It would be anomalous, if not perverse, to require sworn certifications from only the plaintiffs named in a complaint, but then allow others persons to be appointed as Lead Plaintiffs, without attesting to any of the information adjudged appropriate to that standing, by Congress.

*Id.* at 410. The *Chill* court noted the absurd result that would follow: professional plaintiffs would simply wait for someone else to file suit, and would then move to be designated lead plaintiffs, without ever having to divulge their repeat-litigant status. *See id.*

Both opinions are well-reasoned, but the court finds the logic of *Greebel* more persuasive. It seems strained to recast the words "filed with the complaint" to mean "filed with the complaint or motion." And, while professional plaintiffs may attempt to "end run" the certification requirements, the statute still prevents them from *initiating* law suits without revealing their litigation history. Finally, while it might better effect Congress's overall goals of litigation reform to require a certification to be filed with the motion, the legislative history indicates that Congress knew that it was limiting the certification requirement to those who file complaints. Thus, the statute does not require Florida to file a certification.

It might be argued that Florida was under an affirmative duty to divulge its status as a "frequent filer," notwithstanding the statutory loophole for non-complaining movants. Indeed, the *Chill* court stated that its inherent powers justified requiring a certificate, even if the statute did not. *See id.* at 410. However, the Local Rules for the Northern District of California specifically state:

Any party seeking to serve as lead plaintiff, but who does not also file a complaint, need not file the certification required in Civil L.R. 3–7(b), but shall at the time of initial appearance state that

the party has reviewed a complaint filed in the action and either:

(1) Adopts its allegations or, if not,

(2) Specifies the allegations the party intends to assert.

Civ. L.R. 3–7(c). It is difficult to argue that Florida has acted in bad faith when it has complied with the Local Rules (and Florida did indeed file a Local Rule 3–7(c) certification).[9] The court therefore does not find that Florida is barred from serving as lead plaintiff because it failed to file a certification.

b. *Florida's Ability to Serve as Lead Plaintiff Despite Having Filed More Than Five Securities Class Actions in Three Years*

■ The court has concluded that Florida is not barred for mere failure to file a certification. However, this does not mean that Florida may automatically serve as lead plaintiff. The Reform Act's "professional plaintiff" provision [10] states:

> Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3–year period.

15 U.S.C.A. § 78u–4(a)(3)(B)(vi) (West 1997). This provision gives the court considerable discretion to bar repeat litigants, creating a rebuttable presumption that the same plaintiff should not direct more than five securities class actions in three years.

By its own admission, Florida "is currently serving as a lead plaintiff or co-lead plaintiff in six such actions." NYS Pension Fund Group's Reply to the Opposition of Other Movants Seeking Appointment as Lead Plaintiff for the Entire Litigation at 3. Thus, under the terms of the Reform Act, it is presumptively barred from serving as lead plaintiff.

Florida disputes that the professional plaintiff provision is even applicable, because it is an institutional investor, and Congress sought to encourage institutional investors to become lead plaintiffs. Citing the House Conference Report, Florida asserts that the drafters of the Reform Act fully expected institutional investors to exceed the five suits-in-three years provision of the Act. And, the argument goes, because the statute directs the court to consider "the purposes of this section" in exercising its discretion, the court should allow an institutional investor like Florida to serve as lead plaintiff, despite its apparent litigiousness.

■ Florida's arguments do not persuade the court to lift the presumptive bar. The text of the statute contains no flat exemption for institutional investors. Indeed, looking at the section as a whole (and the statute commands consideration of "the purposes of this *section*"), institutional investors are already heavily favored by the requirement that the lead plaintiff have the "largest financial interest" in the litigation. Moreover, Congress also desired to increase client control over plaintiff's counsel, and allowing simultaneous prosecution of six securities actions is inconsistent with that goal. *See Telxon,* 67 F.Supp.2d at 822–23 (denying Florida's lead plaintiff motion for this very reason). Finally, there are no special circumstances indicating that Florida has overcome the presumptive bar created by the "professional plaintiff" provision; for instance, if Florida were the only movant, or if the other movants had accrued an even longer record of participation in securities litigation, the court might be inclined to lift the bar and allow Florida to serve. (It might even make a difference if Florida were the only institutional investor moving to serve

---

9. It is somewhat difficult to understand, however, why a group with Florida as its largest stakeholder was denominated the "New York State Pension Fund Group."

10. The text of the provision does not contain the phrase "professional plaintiff," but it is catchlined as "Restrictions on professional plaintiffs" in the enacted statute.

as lead plaintiff.) On these facts, however, Florida has not demonstrated why it should be excepted from the ban against frequent litigants. Florida may therefore not serve as lead plaintiff.

### 3. Competing Damages Claims of the New York City Pension Funds and the New York State Common Retirement Fund

The court has excluded Florida from consideration as a potential lead plaintiff. With Florida eliminated as a potential lead plaintiff, the two next largest individual plaintiffs are New York City Pension Funds[11] (N.Y.C) and the New York State Common Retirement Fund (N.Y.S). (N.Y.S is considered alone, not together with its "group" partners.) Although the numbers have fluctuated as the parties have assessed and reassessed their estimated damages, NYC currently claims total losses of $71,048,128, while NYS claims a loss of $56,254,275. It would appear that NYC is therefore the presumptive lead plaintiff.

However, the court is not comfortable that NYC's loss and NYS's loss are being compared using the same criteria. Specifically, NYS is arguing that NYC could not have suffered damages greater than $55,751,169 "plus 151,383 'Section 14' shares"—less than its own alleged losses of $56,254,275 and some 168,900 "Section 14" shares.[12] While not directly averting to the possibility of a face-off between the NYS and NYC, the NYS Fund's calculations are an obvious attempt to preclude NYC from becoming lead plaintiff even if Florida is excluded (as it just has been).

Dealing with these competing claims raises at least two dilemmas: (1) whether a court should content itself with losses alleged by movants for lead plaintiff, or attempt an independent examination of alleged damages; and if so, (2) whether the court should allow for discovery, conduct an evidentiary hearing, or even appoint a neutral evaluator to resolve the competing claims.

An even more fundamental problem is deciding what the appropriate measure for claimed losses is. As a rule, securities suits settle. See 3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 9.1 (2d ed. 1999) ("Few 10b–5 cases have reached the relief stage, so there is little law to report."). Given the statutory scheme for quick resolution of the lead plaintiff question, it is undesirable for the court to prejudge the damages issue through an extensive fact-finding process. See 15 U.S.C.A. § 78u–4(a)(3)(B)(i) (West 1997) (requiring court to consider lead plaintiff motions within 90 days of statutory notice). At the same time, the court cannot simply decide to forego an analysis of "largest financial interest," as some movants suggest; the statute requires "the determination of the court." *Id.* § 78u–4(a)(3)(B)(iii)(I)(bb).

One court discussing the "largest financial interest" test suggested consideration of the following factors: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suf-

---

**11.** Although the Funds are separate entities, the court is satisfied that they are essentially one person for purposes of the Reform Act, because they are all under the jurisdiction of New York City Comptroller's Office, and are represented in their dealings with private counsel through one "in-house" counsel, the Corporation Counsel of the City of New York. *See* Declaration of Hilary Klein ¶¶ 1,2,5,6.

**12.** NYS's submissions on its number of Section 14 shares have been inconsistent. *Com-*

*pare* NYS Reply to Movants Seeking Appointment as Lead Plaintiff for Subsets of the Class at 11 (stating that NYS' financial interest in the Section 14(a) claim is 168,900 shares) *with* NYS Opposition to Other Lead Plaintiff Motions at 9 n.12 (claiming a total 235,500 Section 14 Shares for "NYS Pension Fund Group," all of which were owned by Florida). The court relies on counsel's statement at the hearing that the former number is the correct number.

fered during the class period. *In re Olsten Corp. Securities Litigation,* 3 F.Supp.2d 286, 295 (E.D.N.Y.1998) (citing *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at *5 (N.D.Ill. Aug.11, 1997)). These factors are useful, because they look to relatively objective indicators, such as number of shares purchased or sold, rather than to the ultimate question of damages. Unfortunately, the movants have not framed their arguments in these terms, instead presenting a dizzying array of damages calculations in their briefs and declarations.

It might, of course, be possible for the court to reconstruct these numbers from the various moving papers, but given the statute's compressed time-frame for resolving lead plaintiff motions, and the court's disinclination to try to reconcile a truly excessive number of exhibits and declarations,[13] the court will not attempt an independent reconstruction of these factors. *See also Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996) (court under little duty to "scour the record" when the parties fail to identify record evidence with particularity).

The court is disinclined to appoint a special master or otherwise to create satellite proceedings for the purpose of resolving this factual dispute. However, the papers before the court are inadequate to make an informed decision as to the relative loss claims of the two parties. Some additional procedure is necessary.

The court believes that the best course is to require a joint submission on claimed financial interest in the litigation. The court therefore orders that NYC and NYS exchange their data regarding holdings in McKesson, HBOC, and McKesson HBOC stock. Counsel shall then meet and confer to prepare a joint statement, which shall compare the two movants' relative financial stake in the litigation in terms of the four *Olsten–Lax* factors noted above. With regard to the damages estimate (factor four), movants are urged to agree upon a simple, comprehensible methodology for calculating their estimated damages. If there are methodological disagreements, they should be described in the joint statement, and calculations for both movants should be provided using both methodologies. The parties may not file any separate memoranda of points or authorities or declarations, although they may provide the declaration of a jointly selected neutral expert in accounting.

Because proceedings in the consolidated class action will necessarily be stayed for lack of a lead plaintiff, time is of the essence. The court will therefore require that the joint statement be filed by November 19, 1999.

### C. Preliminary Determination of NYC's Ability to Serve as Class Representative Pursuant to Rule 23

The Reform Act also requires that the lead plaintiff "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C.A. § 78u–4(a)(3)(B)(iii)(I)(cc) (West 1997). At the lead plaintiff selection stage, all that is required is a "preliminary showing" that the lead plaintiff's claims are typical and adequate. *Wenderhold,* 188 F.R.D. 577, 587; *Gluck v. CellStar Corp.,* 976 F.Supp. 542, 546 (N.D.Tex.1997). Both NYC and NYS have substantial alleged losses, and both are apparently able to assert both open-market and share exchange purchase claims against defendants. The court is therefore satisfied that either NYC or NYS may serve as lead plaintiff.

### D. Approval of Lead Counsel

The lead counsel provision of the Reform Act states that the appointed plaintiff

---

13. Several movants submitted papers that were hundreds of pages long, including exhibits. NYC even submitted an *amicus curiae* brief disguised as a "Declaration" (complete with numbered paragraphs) by a law professor on the merits of its legal arguments. It is understandably difficult to address so many competing claims within the required page limits, but there are other procedures in place for such situations. *See* Civil L.R. 7–3(b) (parties may seek leave of court to file longer papers).

"shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C.A. § 78u–4(a)(3)(B)(v) (West 1997). The statute vests the initial selection with the plaintiff; the court's role is limited to approval of that choice. *See also Wenderhold,* 188 F.R.D. 577, 587 (taking more active role in selection of counsel when plaintiff was an individual investor with little litigation experience). Both NYC and NYS have provided resumes for their selected firms (each has selected two). The court is satisfied that both movants have selected highly qualified, experienced counsel who will adequately represent the interests of the class, but final approval must wait until the court has appointed lead plaintiff. The court will allow for the selection of two firms, but cautions that this must not result in the duplication of any expenses to the class.

## III. ORDER

For the foregoing reasons, the court enters the following order:

1) The various motions to consolidate all related actions except for the *Cohen* action (99–20916) are granted.[14] The newly consolidated action will bear the docket number 99–20743 and the caption *In re McKesson HBOC, Inc. Securities Litigation.*

2) The court orders NYC and NYS to file a joint statement of claimed financial interest in the litigation on November 19, 1999, as set forth above. Shortly thereafter, the court will appoint either NYC or NYS lead plaintiff. The lead plaintiff will then be directed to file an amended consolidated complaint. Until the lead plaintiff is selected, all proceedings in the consolidated class action are stayed.

3) The court will approve the selection by NYC or NYS, as appropriate, of their counsel as lead counsel.

4) With regard to the possible consolidation of the *Cohen* action, the court will set a hearing date once it has selected a lead plaintiff. When the hearing date is set, the lead plaintiff will be directed to file a memorandum of points and authorities responding to Cohen's objection to consolidation. Cohen and the defendants will have an opportunity to file reply papers. Until the court rules on the objection to consolidation, all proceedings in *Cohen* are stayed.

5) NYC's *ex parte* motion to file its fee agreement under seal is denied.

## IV. APPENDIX

### CASES SUBJECT TO CONSOLIDATION ORDER

| | Name | Case Number |
|---|---|---|
| 1. | Hallin | C–99–20547–RMW |
| 2. | Wechsler | C–99–20555–RMW |
| 3. | Cooper | C–99–20601–RMW |
| 4. | Utah State Retmt. Bd. | C–99–20628–RMW |
| 5. | Aronson | C–99–20743–RMW |
| 6. | Singleton | C–99–20744–RMW |
| 7. | Randolf | C–99–20745–RMW |
| 8. | Bezirdjian | C–99–20746–RMW |
| 9. | Pollock | C–99–20747–RMW |
| 10. | Price | C–99–20748–RMW |
| 11. | Samet | C–99–20749–RMW |
| 12. | Minotto | C–99–20750–RMW |
| 13. | Raven's Wood L.P. | C–99–20751–RMW |
| 14. | Jaroslawicz | C–99–20752–RMW |
| 15. | Wittich | C–99–20753–RMW |
| 16. | Lustigman | C–99–20754–RMW |
| 17. | Foley | C–99–20755–RMW |
| 18. | Mohrfeld | C–99–20756–RMW |
| 19. | Fuchs | C–99–20757–RMW |
| 20. | UFCW Local 342 | C–99–20758–RMW |
| 21. | Kane | C–99–20759–RMW |
| 22. | Atkinson | C–99–20760–RMW |
| 23. | Dibenedetto | C–99–20761–RMW |
| 24. | Eisdorfer | C–99–20762–RMW |
| 25. | Bastia | C–99–20763–RMW |
| 26. | Kinsley | C–99–20764–RMW |
| 27. | Fink | C–99–20765–RMW |
| 28. | Waring | C–99–20766–RMW |
| 29. | OPEIU Local 153 | C–99–20767–RMW |
| 30. | Berman | C–99–20768–RMW |
| 31. | Acker | C–99–20769–RMW |
| 32. | Kurtz | C–99–20770–RMW |
| 33. | Dicker | C–99–20771–RMW |

**14.** The case numbers of the consolidated actions are provided in the Appendix below. The parties should immediately inform the court if there are additional related cases that have not been included in this consolidation order.