MEMORANDUM
 

 TAURO, Chief Judge.
 

 Presently before the court is the motion of Lawrence Greebel, Brian Robinson, and Richard Crane (collectively, “Movants”) to be appointed Lead Plaintiff and for Milberg, Weiss, Bershad, Hynes & Lerach to be appointed Lead Counsel, pursuant to the Private Securities Litigation Reform Act of 1995 (the “PSLRA”). Resolution of this motion involves questions of first impression regarding interpretation of the procedural reforms effectuated by the PSLRA.
 

 I.
 

 BACKGROUND
 

 A.
 
 The Private Securities Litigation Reform Act of 1995
 

 In enacting the PSLRA,
 
 [1]
 
 Congress altered the procedures for bringing class actions under the federal securities laws. The principal impetus underlying this congressional initiative was the belief that the plaintiffs bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement. Senate Report No. 104-98, 104th Congress,
 
 reprinted in
 
 1995 U.S.C.C.A.N. 679, 687-90. To ameliorate these perceived abuses of the class action device in actions brought under the federal securities laws, section 21D imposes disclosure requirements on the plaintiff filing the lawsuit and mechanisms for the appointment of a lead plaintiff.
 

 Section 21D(a)(2) requires plaintiffs to file with their complaint sworn certifications describing, among other things, their transaction in the security and their prior appearances as a plaintiff in a securities class action lawsuit. 15 U.S.C.A. § 78u-4(a)(2). Section 21D(a)(3) sets forth procedures for early notice to purported class members of the filing of the action. 15 U.S.C.A. § 78u — 4(a)(3). Under that section, the named plaintiff in the action must file notice to potential class members within 20 days of filing the suit to inform them of their right to move to be appointed lead plaintiff. 15 U.S.C.A. § 78u-4(a)(3)(A)(i). Such notice must be published “in a widely circulated national business-oriented publication or wire service.” 15 U.S.C.A. § 78u-4(a)(3)(A)(i).
 

 Section 21D(a)(3) also alters the procedure for appointment of lead plaintiff for the purported class.
 
 [2]
 
 Section 21D(a)(3)(B)(i) provides that:
 

 Not later than 90 days after the date on which a notice is published ... the court shall consider any motion made by a pur
 
 *59
 
 ported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members ...
 

 15 U.S.C.A. § 78u-4(a)(3)(B)(i). In making this determination, the statute erects a rebuttable presumption that the most capable plaintiff is the person with the largest financial interest in the relief sought by the class, and “otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.” 15 U.S.C.A § 78u-4(a)(3)(B)(iii)(I). The presumption may be rebutted only “upon proof by a member of the purported plaintiff class” that the presumptively most capable plaintiff “will not fairly and adequately protect the interests of the class” or is “subject to unique defenses.” 15 U.S.C.A. § 78u-4(a)(3)(B)(iii)(II). A purported class member may undertake discovery to mount such a challenge only if he or she “first demonstrates a reasonable basis for finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.” 15 U.S.C.A § 78u-4(a)(3)(B)(iv).
 

 Finally, under section 21D(a)(3)(B)(v), the lead plaintiff “shall, subject to the approval of the court, select and retain lead counsel.” 15 U.S.CA § 78u-4(a)(3)(B)(v).
 

 B.
 
 Procedural History
 

 On March 14, 1996, Lawrence Greebel, on behalf of himself and all other similarly situated persons, filed this action against FTP Software, Inc. and various officers of FTP (collectively, “FTP”). In his complaint, Greebel alleges that, between July 14, 1995 and January 3, 1996, FTP made materially false representations and omissions regarding FTP, in violation of sections 10(b) and 20(a) of the Securities Exchange Act. With his complaint, Greebel filed a certification pursuant to section 21D(a)(2).
 

 On March 18, 1996, Greebel supplied a press release to
 
 Business Wire
 
 for transmission over its computer database.
 
 Business Wire
 
 “electronically disseminate[s] full-text news releases for public and investor relations professionals simultaneously to the news media, on-line services and databases, the Internet and the investment community worldwide.”
 
 Business Wire
 
 Mission Statement attached as Exhibit A to Movant’s Reply Memorandum. The press release contained the information required by section 21D(a)(3)(A).
 

 The full text of the press release was picked up by the
 
 Bloomberg Business News Wire.
 
 The
 
 Wall Street Journal, Boston Globe,
 
 and
 
 Dow Jones Wire Service,
 
 among others, picked up the story of the filing of the lawsuit, but did not run the paragraphs of the press release relating to a purported class members’ right to move to be lead plaintiff.
 

 On May 15,1996, Movants filed the instant motion to be appointed Lead Plaintiff and for Milberg, Weiss, Bershad, Hynes & Lerach to be appointed Lead Counsel. Crane and Robinson did not file certifications pursuant to section 21D(a)(2), though they did represent through counsel that they met the criteria set forth in that section. FTP opposes the motion.
 

 II.
 

 DISCUSSION
 

 FTP articulates three objections to Movants motion to be appointed lead plaintiff: (1) that Robinson and Crane have failed to comply with the PSLRA’s certification requirement, (2) that Greebel’s notice failed to satisfy the PSLRA’s publication requirement, and (3) that it is premature to determine whether Movants meet the criteria for a lead plaintiff set forth in section 21D(a)(3)(B)(iii). As well as responding to the merits of these objections, Movants contend that FTP lacks standing to oppose their motion.
 

 A.
 
 Standing
 

 Movants maintain that the PSLRA’s lead plaintiff provisions were enacted for the benefit of investors, i.e., members of the putative class, and, therefore, Congress did not intend to give defendants in securities class actions
 
 *60
 
 standing to oppose a motion for appointment of a lead plaintiff. FTP disagrees.
 

 Neither of the parties’ positions accurately capture the procedural scheme created by Congress. Rather, the standing of a defendant to challenge a motion to be appointed lead plaintiff depends on the basis of that challenge.
 

 The structure of the new procedural provisions demarcates the line at which defendants have an interest in challenging the adequacy of a person seeking to become a lead plaintiff. Section 21D(a)(2) and section 21D(a)(3)(A) set forth prerequisites for bringing a class action. Failure of the named plaintiff to file a certification with the complaint and to serve notice to class members are fatal to maintenance of the putative class action.
 

 And so, defendants have the same interest in demanding compliance with these provisions as they have with other requirements relating to certification of a class. Further, permitting a defendant to object on these grounds enhances effective judicial administration of the case. Where, for example, questions arise regarding the adequacy of the notice, it is doubtful that a court could make an informed analysis without the input of a defendant.
 
 Cf.
 
 Weiss and Beckerman,
 
 rnpra
 
 note 2 at 2101 (explaining that with respect to the determination of class certification, courts permit defendants, as the best available surrogates, to mount challenges to the typicality and adequacy of the putative class representative). If notice is indeed inadequate, the court cannot rely on other putative class members to proffer opposition because,
 
 a fortiori,
 
 they are unaware of the lawsuit.
 

 By the same token, however, the provisions in section 21D(a)(3)(B) relate to who will stand as the lead plaintiff, subject to reconsideration at the time of class certification. The text of that subsection clearly indicates that this issue is one over which only potential plaintiffs may be heard. For example, Congress provided that rebuttal of the lead plaintiff presumption shall be limited to “proof by a member of the purported plaintiff class.” 15 U.S.C.A. § 78u-4(a)(3)(B)(iii)(II). Similarly, the right to conduct discovery is explicitly restricted to purported class members. 15 U.S.C.A. § 78u-4(a)(3)(B)(iv).
 

 FTP maintains that, because they have a due process right to challenge certification of a class, they have a similar concern with respect to who is appointed lead plaintiff. They point out that, in applying the standards of section 21D(a)(3)(B)(iii)(I), a court should presume that the most adequate plaintiff is the person or group of persons that:
 

 (aa) has either filed the complaint or made a motion in response to a notice ...;
 

 (bb) in the determination of the court has the largest financial interest in the relief sought by the class; and
 

 (ce)
 
 otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.
 

 15 U.S.C.A. § 78u — 4(a)(3)(B)(iii)(I) (emphasis added). FTP argues that appointment by the court of a lead plaintiff would prejudice FTP’s ability to later challenge the lead plaintiff as an inadequate class representative in light of the court’s finding of “satisfaction,” pursuant to subsection (cc).
 

 Congress intended that the lead plaintiff be determined at an early stage of the litigation. Though neither the text of the PSLRA nor its legislative history explicitly describe the relationship between motions for lead plaintiff and motions for class certification, it seems clear that Congress recognized that these motions involved distinct inquiries. Section 21D(a)(3)(B) refers throughout its text to “purported class members.” Congress implicitly understood, therefore, that lead plaintiff motions would be decided prior to consideration of certification issues.
 

 This court concludes, therefore, that FTP lacks standing to challenge whether Movants satisfy the criteria set forth in section 21D(a)(3)(B)(iii). But, this court also concludes that its determination to appoint a person or persons as lead plaintiff must be without prejudice to the possibility of revisiting that issue in considering a motion for class certification.
 
 See
 
 House Conference Report No. 104-369, 104th Congress,
 
 re
 
 
 *61
 

 'printed in
 
 1995 U.S.C.CAN. 730, 733 (“The provisions of the bill relating to the appointment of lead plaintiff are not intended to affect current law with regard to challenges to the adequacy of the class representative or typicality of the claims among the class.”). Any other view would frustrate the congressional purpose underlying the lead plaintiff provisions, which is to allow early intervention and control of the lawsuit by the most adequate plaintiff — presumably, the investor with the largest stake.
 
 See
 
 U.S.C.C.A.N. at 731.
 

 In sum, the court concludes that FTP may object to the adequacy of certification and notice, insofar as they are procedural prerequisites for consideration of a motion for lead plaintiff. But FTP may not oppose the motion on grounds relating to the moving parties satisfaction of the criteria enumerated in section 2 ID(a) (3) (B)(iii) (I).
 

 B.
 
 The Certification Requirement
 

 Though Greebel filed a section 21D(a)(2)(A) certification with his complaint, Robinson and Crane did not file a certification with their motion to be appointed lead plaintiff. FTP maintains that such a certification is a prerequisite to appointment as a lead plaintiff.
 

 Section 21D(a)(2)(A) requires that “each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint ...” 15 U.S.C.A. § 78u-4(a)(2)(A). With respect to whom this certification requirement applies, the text arguably points in two directions. On the one hand, as FTP urges, the reference to one “seeking to serve as a representative party” suggests that certification is required for all persons seeking to serve in a representative capacity. On the other hand, the Movants point to the references to “plaintiff’ and “filed with the complaint” as support for concluding that the certification requirement is limited to named plaintiffs filing a class action complaint. For the following reasons, the court concludes that the latter is the better reading of the provision.
 

 The text of statute should be read in a manner that gives each term meaning.
 
 Grunbeck v. Dime Sav. Bank of New York,
 
 74 F.3d 331, 338 (1st Cir.1996). To give credence to FTP’s reading, the reference to “filed with the complaint” must be read out of the statute. Here, Congress mandated that a certification be filed with the complaint, but did not expressly require that a certification be filed with a motion to be appointed lead plaintiff. In light of the detailed revision of procedures under the PSLRA, this omission does not appear to be an oversight.
 

 Moreover, limiting the certification requirement to parties filing complaints is consistent with the Congressional purpose underlying the PSLRA.
 
 See Summit Inv. and Dev. Corp. v. Leroux,
 
 69 F.3d 608, 609 (1st Cir.1995) (meaning of discrete statutory language is to be gleaned from statute as a whole, including its overall policy and purpose). The purpose of requiring certification with the complaint is to slow the race to the courthouse by so-called professional plaintiffs.
 
 See
 
 1995 U.S.C.C.AN. at 732. Requiring the named plaintiff to certify that he or she has not served as a plaintiff in a securities class action within the last five years serves that purpose. Extending the certification requirement to purported class members later moving to become a lead plaintiff would not.
 

 As FTP notes, Congress was also concerned about the lack of control exercised over a lawsuit by a professional plaintiff serving as the lead plaintiff. But, Congress employed a different device to address this problem, namely, subsection 21D(a)(3)(B)(iv). That subsection specifically restricts a professional plaintiff from serving as lead plaintiff unless the court otherwise permits.
 
 [3]
 

 
 *62
 
 Further, even if the text of the statute were ambiguous, the legislative history resolves the question. The Senate Committee Report explains that it “does not intend for the members of the purported class who seek to serve as lead plaintiff to file with this motion the certification described above.” 1995 U.S.C.CAN. at 690. The Conference Committee reiterated this sentiment. 1995 U.S.C.CAN. at 732-33 (“Members of the purported class who seek to serve as lead plaintiff do not have to file the certification filing as part of this motion.”).
 

 Accordingly, the court concludes that a purported class member seeking to serve as lead plaintiff is not required to file a certification, pursuant to section 21D(a)(2)(A), with his or her motion.
 
 [4]
 

 C.
 
 The Publication Requirement
 

 FTP next contends that Greebel’s press release on
 
 Business Wire
 
 failed to satisfy the PSLRA’s publication requirement. Section 21D(a)(3)(A) provides:
 

 Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published,
 
 in a widely circulated national business-oriented publication or wire service,
 
 a notice advising members of the purported plaintiff class—
 

 (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
 

 (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.
 

 15 U.S.CA § 78u-4(a)(3)(A) (emphasis added). As
 
 Business Wire
 
 is business-oriented, FTP’s objection to Greebel’s notice focuses on whether
 
 Business Wire
 
 qualifies as “widely circulated” and as a “wire service.”
 

 The PSLRA does not define “widely circulated” or “wire service.” Because these terms are not self-defining, it is appropriate to examine the legislative history to determine Congress’ understanding of them.
 
 Wisconsin Pub. Intervenor v. Mortier,
 
 501 U.S. 597, 610 n. 4, 111 S.Ct. 2476, 2484 n. 4, 115 L.Ed.2d 532 (1991). The Senate Committee Report states that the Committee “intends ‘publication’ to encompass a variety of mediums, including wire, electronic, or computer services.” 1995 U.S.C.C.AN. at 690. The Conference Committee Report echoes this understanding of the publication provision: “ ‘Publication’ includes a variety of media, including wire, electronic or computer services.” 1995 U.S.C.CAN. at 733. As such, it seems clear that the mere fact that
 
 Business Wire
 
 arrives at a print publication via an electronic signal, rather that in the manner of a traditional wire service, does not disqualify it as a “wire service” within the meaning of the statute.
 

 Once
 
 Business Wire
 
 is recognized as a wire service, it cannot be gainsaid that it is widely circulated. Indeed, the circulation of a press release on
 
 Business Wire
 
 takes two forms. First,
 
 Business Wire
 
 is subscribed to by hundreds of print publications and wire services, encompassing news media in all fifty states. Here, the full text of the press release reached investors through the
 
 Bloomberg Wire Service,
 
 which the parties agree is a staple of institutional investors. Second,
 
 Business Wire
 
 press releases can be accessed directly by consumers of news through subscriber on-line services and databases.
 

 FTP, nonetheless, maintains that
 
 Business Wire
 
 circulation is chancy and, therefore, should not be viewed as satisfying the PSLRA In support, FTP argues that receipt of a
 
 Business Wire
 
 press release depends on either (1) a news medium running the press release, or (2) the investor having access to
 
 Business Wire’s
 
 database and conducting a search for information about FTP. This court disagrees. Such criticism could
 
 *63
 
 be leveled at any form of notice that stops short of actual service on purported class members. If Congress had intended to eliminate the contingency of a print medium carrying a wire service story, it would not have allowed publication by means of a wire service. The court cannot read the reference to “wire service” out of the statute.
 
 See Gade v. National Solid Wastes Management Ass’n, 505
 
 U.S. 88, 100, 112 S.Ct. 2374, 2384, 120 L.Ed.2d 73 (1992) (court’s should avoid interpreting a provision in a way that is inconsistent with a necessary assumption of another provision).
 

 Moreover, the likelihood of an FTP investor actually seeing a press release from
 
 Business Wire
 
 is arguably as great as finding such information by skimming the back pages of the
 
 Wall Street Journal.
 
 Through a subscriber service, an investor can target searches of
 
 Business Wire’s
 
 database for information about FTP and, thereby, routinely follow the company’s activities. The fact that FTP often uses
 
 Business Wire
 
 to circulate its press releases makes it likely that investors will be seeking follow up information about FTP from this source. Additionally, reliance on
 
 Business Wire
 
 is not subject to the happenstance of purchasing a paper on the day that notice appears, for the press release may remain accessible on the database for a substantial period of time.
 

 FTP seeks refuge in another phrase of section 21D(a)(3)(A), namely, the requirement that the plaintiff shall “cause [notice] to be published.” FTP maintains that this phrase means to purchase an advertisement in a newspaper. In support of this reading, FTP cites to numerous notice statutes that use the phrase “cause to be published in a newspaper” as a surrogate for running an advertisement in a newspaper and suggests that Congress drafted the PSLRA in the context of this presumed meaning of “cause to be published.” If Congress had limited the medium for notice under the PSLRA to newspapers, the court might be inclined to agree. But, Congress permitted notice by means of wire services in which paid advertising does not exist. Again, FTP’s reading would require the court to erase the phrase “wire service” from the statute. Here, Greebel “caused” publication within the ordinary meaning of that term, by instructing
 
 Business Wire
 
 to disseminate the press release to news media and to place it on its database for searches by its subscribers.
 
 [5]
 

 See Will v. Michigan Dept. of State Police,
 
 491 U.S. 58, 64, 109 S.Ct. 2304, 2308-09, 105 L.Ed.2d 45 (1989) (court’s should follow the ordinary usage of terms unless Congress gives them a specified meaning).
 

 Notwithstanding this examination of the particular terms and phrases of section 21D(a)(3)(A), FTP contends that a narrower reading of the publication requirement is necessary to fulfill Congress’ purpose that notice be reasonably calculated to reach all members of the prospective class. The dissonance between the text of the statute and this purported congressional purpose, however, suggests a different view. Why would Congress enact such a broadly phrased notice provision? The answer appears to be that Congress’ purpose was not to ensure notice to the entire class, but merely to those sophisticated and institutional investors that Congress deemed presumptively most adequate to serve as lead plaintiffs in securities class actions. It is precisely this sort of investor who is likely to become aware of a press release issued by a wire service through electronic and computer media.
 

 The provisions of the PSLRA that suggest a presumption that institutional investors be appointed lead plaintiff supports this position.
 
 See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,
 
 510 U.S. 86, 94-95, 114 S.Ct. 517, 523-524, 126 L.Ed.2d 524 (1993) (statutory provision should be read by reference to the whole act). Furthermore, the legislative history supports such an interpretation of congressional purpose. The Senate Committee Report explained:
 

 The Committee believes that increasing the role of institutional investors in class actions will ultimately benefit the class and assist the courts____ Scholars predict
 
 *64
 
 that increasing the role of institutional investors will benefit both injured shareholders and courts: “Institutions with large stakes in class actions have much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were ‘fair and reasonable’ than is the ease with settlements negotiated by unsupervised plaintiffs’ attorneys.” The Committee believes that an institutional investor acting as lead plaintiff can, consistent with its fiduciary obligations, balance the interests of the class with the long-term interests of the company and its public investors.
 

 1995 U.S.C.C.A.N. at 690 (quoting Weiss and Beekerman,
 
 supra
 
 note 2).
 
 See also
 
 1995 U.S.C.C.A.N. at 733 (“Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake.”).
 

 The only contrary piece of legislative history advanced by FTP is an isolated statement made by Senator Boxer on the Senate floor as she argued in favor of the proposed Boxer-Bingaman Amendment, Amendment No. 1475. The Boxer-Bingaman Amendment would have excised the statutory provisions tilting appointment of a lead plaintiff toward large investors and, in its place, allow the entire class of investors to vote on who should serve as lead plaintiff. 141 Cong.Rec. S9089, S9089 (June 26, 1995). The amendment did not carry. 141 Cong.Rec. D791, D791 (June 27,1995).
 

 And so, it is clear that publication need not be structured to reach the putative entire class in order to meet the purposes of the statute.
 
 [6]
 
 Because publication on
 
 Business Wire
 
 is reasonably calculated to reach, at the least, sophisticated and institutional investors, the court cannot find that such publication frustrates the purpose of the PSLRA.
 

 For all these reasons, the court concludes that Greebel’s press release on
 
 Business Wire
 
 satisfied the requirements of section 21D(a)(3)(A).
 

 D.
 
 Section 21D(a)(3)(B)(iii)’s Presumption
 

 In applying the rebuttable presumption under section 21D(a)(3)(B)(iii), a court should presume that the most adequate plaintiff is the “person or group of persons that—
 

 (aa) has either filed the complaint or made a motion in response to a notice ...;
 

 (bb) in the determination of the court has the largest financial interest in the relief sought by the class; and
 

 (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.
 

 15 U.S.C.A. § 78u-4(a)(3)(B)(iii)(I).
 

 Movants have filed a motion to be appointed lead plaintiff. As no other persons have sought to be appointed lead plaintiff, they have the largest financial interest in the relief sought by the class. And, Movants have submitted sufficient information to the court to satisfy their burden of making a prima facie showing that they satisfy Rule 23’s numerosity, commonality, typicality, and adequacy requirements.
 
 [7]
 
 Accordingly, the court concludes (1) that Movants should be appointed lead plaintiff, and (2) that, in light of the conceded expertise of Milberg, Weiss, Bershad, Hynes & Lerach in securities class actions, the court should approve Movants’ selection of that firm as lead counsel.
 

 III.
 

 CONCLUSION
 

 For the reasons stated above, Greebel, Robinson, and Crane’s motion to be appointed lead plaintiff and to appoint Milberg,
 
 *65
 
 Weiss, Bershad, Hynes & Lerach as lead counsel is ALLOWED.
 

 [1]
 

 . Section 101(b) of the PSLRA amends the Securities Exchange Act by adding section 2ID, codified at 15 U.S.C.A. § 78u-4 (West Supp.1996).
 

 [2]
 

 . The inspiration for this provision was the article by Elliot J. Weiss and John S. Beckerman,
 
 Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,
 
 104 Yale L.J. 2053 (1995).
 
 See
 
 1995 U.S.C.C.A.N. at 690 n. 32.
 

 [3]
 

 . Here, Crane and Robinson have represented through counsel that neither has "sought to serve or served as a representative party on behalf of a class in an action filed under the federal securities laws.” Declaration of Samuel H. Rudman in Support of Motion To Be Appointed Lead Plaintiff Pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 and for Appointment of Lead Plaintiff’s Counsel at ¶¶ 3 and 4. FTP does
 
 *62
 
 not contend that this representation is insufficient to satisfy section 21D(a)(3)(B)(iv).
 

 [4]
 

 . Nonetheless, as discussed above, the appointment of a lead plaintiff at this time is not dispositive with respect to the ultimate certification of the class and designation of a class representafive. Should subsequent discovery reveal that the representations of Crane and Robinson regarding their prior involvement in securities class actions are inaccurate, the court may revisit the lead plaintiff determination.
 

 [5]
 

 . It seems unlikely that FTP would urge that it has not "caused" the dissemination of material information for purposes of the federal securities laws when it issues a press release on
 
 Business Wire.
 

 [6]
 

 . This understanding of Congress’ purpose finds additional support in the source of its inspiration. Under the proposal advanced by Weiss and Beekerman, early notice of the pendency of a putative class action should be "provided to prospective class members with potentially large claims.” Weiss and Beekerman,
 
 supra
 
 note 2 at 2108.
 

 [7]
 

 . The court reiterates that this conclusion is without prejudice to FTP contesting class certification.