## In re CENTURY BUSINESS SERVICES SECURITIES LITIGATION.

No. 1:99CV2200.

United States District Court,
N.D. Ohio,
Eastern Division.

March 30, 2001.

Dennis R. Lansdowne, Spangenberg, Shibley, Lancione & Liber, Jack Landskroner, Monica Zunt, Landskroner Law Firm, Cleveland, OH, Steven E. Cauley, Scott E. Poynter, Cauley, Geller, Bowman & Coates, Little Rock, AR, for plaintiffs.

Daniel P. Mascaro, Paul P. Eyre, Baker & Hostetler, Cleveland, OH, David H. Kistenbroker, Leah J. Domitrovic, Pamela G. Smith, Theresa L. Davis, Katten, Muchin & Zavis, Chicago, IL, Gregg C. Laswell, J. Stephen Barrick, Akin, Gump, Strauss, Hauer & Feld, Houston, TX, for defendants.

## MEMORANDUM OF OPINION AND ORDER RE: DENYING ALL MOTIONS FOR LEAD PLAINTIFF AND LEAD COUNSEL

MATIA, Chief Judge.

Pending before this Court are seven (7) putative class actions against defendant Century Business Services Inc., and certain of its officers and directors (collectively "CBIZ"). These actions were consolidated for all purposes on April 13, 2000. (Doc. 33.) Pursuant to the framework set forth in the Private Securities Litigation Reform Act ("the Reform Act"), three competing groups filed motions for appointment as lead plaintiff of the consolidated action.[1] 15 U.S.C. § 78u–4. Each group's motion also asked the Court to approve its choice for lead and liaison counsel. After thoroughly considering all memoranda related to the various groups, the Court finds that none of the proposed groups satisfy the requirements for appointing lead plaintiff and lead counsel at this time. For the reasons set forth below, the Court will *DENY* all motions for lead counsel.

---

1. The Court considered the following motions: Motion of Mark Dewlow, Leonard Feder, and Maryanne Aquilina (Doc. 16); Motion of Scott Korn (Doc. 30); and Motion of Joe Marsh and Lee Marshall (Doc. 12, Case No. 1:00CV0584).

The motion on behalf of the Tozour Family Trust was withdrawn. (Doc. 17, Case No. 1:00CV0340.) The Court asks that the Clerk of Court reflect all of these motions, as well as this Order, in the master case, 1:99CV2200.

## I. Background

Beginning on September 16, 1999, three securities fraud class actions were filed against CBIZ. Each of these cases charges CBIZ with violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs premise their claims on several alleged misstatements of material fact on CBIZ's part. This first wave of cases sought to represent all purchasers of CBIZ stock from February 6, 1998, to November 23, 1999. After a case management conference, the Court consolidated all three class actions. (Consolidation Order 4/13/00 (Doc. 33).) From this original set of cases, only one plaintiff group filed a motion for appointment as lead plaintiff in accord with the Reform Act ("the Dewlow group").

While the Dewlow group's motion for lead plaintiff was pending, three additional putative class actions suits were filed against CBIZ. Like the first group, these later-filed cases alleged violations of § 10(b) and § 20(a) of the Exchange Act and violation of Rule 10b–5. These actions, however, represented share purchasers in a later class period spanning from March 4, 1999, to January 28, 2000.

In the interest of avoiding duplicative litigation, the Court scheduled a pretrial hearing to determine the propriety of consolidating these actions. During the telephonic conference scheduling the hearing, counsel for the Dewlow group indicated that they were considering amending the original complaint to include portions of the later class period. (Dewlow Response (Doc. 35) at 3–4.) Given this prospect, the Court conducted a hearing to discuss the consolidation issue as well as explore a possible agreement as to lead plaintiff and lead counsel. Despite counsel's earlier indications, they did not file an amended complaint by the time of the hearing. At the close of the hearing, the Court determined, and the parties agreed, that consolidation was proper with the caveat that the issue could be revisited at the time of trial. (Consolidation Order (Doc. 33) at 6.)

The parties also indicated that they would explore an agreement as to lead plaintiff and lead counsel following the hearing. (Korn Memorandum in Supp. of Lead Plaintiff (Doc. 30) at 1–2.) On March 29, 2000, Plaintiffs' counsel held a telephone conference to discuss arrangements for an agreed lead plaintiff.

Unfortunately for all involved, no agreement was reached, and a series of competing motions for lead plaintiff and lead counsel ensued.[2] Along with the Dewlow group's motion, pending since November 1999, three additional groups filed motions for lead plaintiff by the dates prescribed in the Reform Act. It is fair to say that the memoranda supporting these motions evidence a complete degeneration of the cooperative spirit displayed at the hearing. Not only was there no agreement reached as to lead plaintiff, but the Court notes with particular disfavor the caustic nature of the competing briefs. Moreover, the Court cannot help but point out the irony in the fact these briefs were filed by counsel all purporting to represent the same interests.

Acerbic tone aside, the competing motions present several inconsistent alternatives for appointing a lead plaintiff. Simply put, the competing requests appear to be at odds with either the requirements of the Reform Act or the Court's Consolidation Order. Briefly stated, the Court is asked to do one of the following: (1) appoint the Dewlow group as lead plaintiff, at least with respect to the first set of cases filed; (2) appoint the group of investors led by Scott Korn as lead plaintiff ("the Korn Group") for the entire consolidated action, (3) appoint the group of Joe Marsh and Lee Marshall ("the Marsh group") as lead plaintiff for the entire action; or (4) appoint the combination of the Marsh group and the Dewlow group ("the Marsh/Dewlow group") as co-lead plaintiffs. Along with these motions came requests to appoint each group's choice of lead and liaison counsel. As detailed below, the Court finds that none of these options satisfy *all* of the requirements of the Reform Act.

---

2. According to Scott Korn's counsel, the Dewlow counsel were unwilling to agree to a lead plaintiff. Also, counsel for Lee Marsh rejected an agreement and, despite consolidation, stated that the Dewlow group and the Marsh group should pursue lead plaintiff status for separate actions. (Korn Memorandum in Supp. of Lead Plaintiff (Doc. 30) at 1–2.)

## II. Analysis

### A. The Reform Act

In 1995, Congress enacted the Private Securities Litigation Reform Act to curb perceived abuses in bringing securities class actions. Specifically, Congress took aim at the plaintiff bar's ability to bring "strike" suits that benefitted the lawyers to a far greater degree than any of the injured shareholders. See, e.g., *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 191 (1st Cir.1999) ("The enactment of the PSLRA in 1995 marked a bipartisan effort to curb abuse in private securities lawsuits, particularly the filing of strike suits.") (citing H.R. Conf. Rep. No. 104–369, at 32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731). To further this goal, the Reform Act included various provisions to ensure that investors took control of their litigation, not lawyers with an independent financial interest in the suits. See, *e.g., Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 58 (D.Mass.1996) ("The principal impetus underlying [the Reform Act] was the belief that the plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement.") (citing Sen. R. No. 104–98, at 8–11 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 687–90).

One of the most powerful changes made by the Reform Act was a new mechanism for appointing a lead plaintiff and lead counsel. Where multiple actions are filed, the Reform Act set the schedule for appointing the lead plaintiff:

> If more than one action on behalf of a class asserting substantially the same claim or claims arising under this title has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the determination required by clause (i) [appointing lead plaintiff] *until after the decision on the motion to consolidate is rendered.* As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead

plaintiff for the consolidated actions in accordance with this paragraph.

15 U.S.C. § *78u–4*(a)(3)(B)(ii)(emphasis added).[3] The lead plaintiff is "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." *Id.* § 78u–4(a)(3)(B)(i). In keeping with the goal of returning control to investors, the Reform Act creates the presumption that the investor with largest financial stake will serve as lead plaintiff. The Reform Act states that:

> the court shall adopt a presumption that the most adequate plaintiff [or lead plaintiff] in any private action arising under this title is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>
> (bb) *in the determination of the court, has the largest financial interest in the relief sought by the class;* and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u–4(a)(3)(B)(iii)(I)(aa)–(cc) (emphasis added). This presumption can only be overcome by a showing that proposed lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u–4(a)(3)(B)(iii)(II).

Along with detailing the process for appointing a lead plaintiff, the Reform Act controls the selection of counsel for the putative class. This provision, however, is tied largely to the selection of the lead plaintiff. The Reform Act states that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Id.* § 78u–4(a)(3)(B)(v). This simple provision creates huge incentives for counsel to have their clients selected as lead plaintiff.

---

**3.** Because a related case was filed in the Northern District of Maryland and subsequently transferred to this Court, a good deal of time passed before the Court could consider the motions at bar. After transfer, a motion to consolidate this last action was filed on December 26, 2000. The

Court granted that motion on January 26, 2001. After giving counsel in the transferred case sufficient time to enter an appearance or file any motions related to the lead plaintiff issue, the Court considered all motions for lead plaintiff.

## B. The Lead Plaintiff

The Reform Act mandates that the lead plaintiff meet three key requirements: (1) file a timely motion, (2) have the largest stake in the case, and (3) satisfy the prerequisites for maintaining a class action under Fed.R.Civ.P. 23(a). *Id.* § 78u–4(a)(3)(B)(iii)(I)(aa)–(cc). Plaintiffs meeting all three requirements are presumed to be the most adequate or lead plaintiff. Here, none of the groups seeking appointment as lead plaintiff satisfy the criteria listed above. After considering the motions, it is clear that this action has no presumptive lead plaintiff, and the Court will not appoint one at this time.

### 1. The Dewlow Group

■ The Dewlow group filed a timely motion for appointment as lead plaintiff prior to the consolidation of these actions. All Reform Act notice provisions were satisfied, therefore, the Court will focus solely on whether the group meets the remaining lead plaintiff requirements.[4] Clearly, the Dewlow group does not.

The Dewlow group consists of three investors claiming losses in excess of $55,000.[5] This group has, by far, the *lowest* financial stake of any competing lead plaintiff.[6] Nonetheless, it contends that it has "the largest financial interest in the *original litigation* involving the *Original Class Period*, and should, therefore, be appointed Lead Plaintiffs." (Dewlow Response (Doc. 35) at 5.) The Court readily agrees. The Dewlow group has the largest stake in the *original litigation* involving the *original class period* simply because it is the *only* group that can fit that description. It was the original group to file a case against CBIZ, and by virtue of being first to file, it comprised the original class.

The Dewlow group, however, cannot simply define the class they seek to represent. It fails to meet any standard set forth in the Reform Act for appointing lead plaintiff. The group is not the largest stakeholder in the consolidated action, and, by its own definition, it is not typical of the entire class of plaintiffs. Metaphorically speaking, the Dewlow plaintiffs are simply trying to shrink the kingdom until they are king. Just because the group filed the "very first securities complaint against CBIZ," does not yield the conclusion that it should be lead plaintiff for all or part of this matter. (Dewlow Response (Doc. 35) at 5, n. 8.)

Setting aside the fact that this argument runs completely afoul of the Consolidation Order, Counsel's first-to-file logic is precisely what the Reform Act sought to eradicate. As one court wrote:

> One of the principal legislative purposes of the [Reform Act] was to prevent lawyer-driven litigation. Appointing lead plaintiff on the basis of financial interest, rather than on a *'first come, first serve' basis*, was intended to ensure that institutional plaintiff with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers.

---

4. The Reform Act's notice and timing provision reads:

    Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class—
    (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
    (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.
    15 U.S.C. § 78u–4(a)(3)(A)(i). The other competing motions met this standard as well. As such, the Court will turn its attention to the remaining two factors listed in 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb)–(cc).

5. Plaintiffs Dewlow, Feder, and Aquilina claim losses of $45,355.73, $6,631.40, and $3,526.28 respectively.

6. The Reform Act does not explain how a court should determine the largest financial interest, but one court has recognized four factors:

    (1) the number of shares purchased during the class period;
    (2) the number of net shares purchased during the class period;
    (3) the total net funds expended during the class period; and
    (4) the approximate losses suffered during the class period.

    *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, 1997 U.S. Dist. LEXIS 11866 (N.D.Ill. Aug. 11, 1997).

*In re Donnkenny Inc. Securities Litigation,* 171 F.R.D. 156, 157 (S.D.N.Y.1997) (citing H.R. Conf. Rep. No. 104–369, at 31–35 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730–34) (emphasis added). The Dewlow group has suffered a nominal loss in comparison to the other competing groups, yet counsel insists that the group should be a lead plaintiff because of the *timing* of their complaint. The Court finds no reason to undercut one of the key principles supporting the Reform Act by giving weight to the fact that the Dewlow group filed the "original action."

Perhaps counsel's strongest argument—still based on the notion that they filed first—is that the complaint lists an earlier class period than other competing actions. The Dewlow group repeatedly references the fact that it speaks for shareholders "during a completely different, non-overlapping period of time." (Dewlow Response (Doc. 35) at 2.) While this is a true statement, differences in class periods have not precluded other Courts from appointing a lead plaintiff that represents sightly different shareholder groups. See, e.g., *In re Olsten Corp. Sec. Litig.,* 3 F.Supp.2d 286 (E.D.N.Y.1998); *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, 1997 U.S. Dist. LEXIS 11866 (N.D.Ill. Aug. 6, 1997) ("The varying class periods can nevertheless be harmonized because all of the complaints are based on a common set of operative facts."). Despite counsel's concern over the "temporal gap" in the class periods, the fact remains that these cases were consolidated because they share a common nucleus of fact and law.[7]

Even assuming *arguendo* that the gap between the class period is too large to treat these cases as one action, the Court can only wonder why this issue is being raised in the lead plaintiff context. While not explicitly saying so, counsel for the Dewlow group appear to be revisiting the issue of consolidation. The Court's Consolidation Order issued on April 13, 2000. One would think that

if counsel opposed consolidation, they would, at a minimum, raise the issue with the Court within a year's time.[8] Moreover, counsel's slavish reliance on the different class periods to support their motion seems misplaced given their actions to date. Not only did counsel for the Dewlow group acquiesce to consolidation at the hearing, but their own brief acknowledges that "there is no question that consolidation will be an efficient way to bring the two class periods together in one proceeding." (Dewlow Response (Doc. 35) at 4.)

Even more striking, counsel fails to acknowledge that their own actions helped *trigger* consolidation and blurred the already thin line between the class periods. First, in a conference call with the Court, counsel expressed an interest in amending the complaint to include portions of the later class period. (Dewlow Response (Doc. 35) at 3–4.) Although counsel never filed an amended complaint, their actions show their willingness to lump plaintiffs from different class periods into one group. Curiously, counsel not only gave *public notice* that they intended to file, *but they expressly stated that they had filed* an amended complaint covering the later class period. In an apparent attempt to comply with the Reform Act's notice provision, counsel for the Dewlow group posted two notices on the *Business Wire.*[9] A notice dated February 7, 2000, stated that counsel *"have filed"* an amended complaint to include purchases of common stock *between November 9, 1999, and January 28, 2000, inclusive."* (Korn Memorandum in Supp. of Lead Plaintiff (Doc. 30) Ex. A.) Counsel failed to mention these notices in their memoranda, in their conference call with the Court, or at the consolidation hearing—a hearing that occurred over a month after the notices were published.

Given counsel's silence as to the *Business Wire* notices, the Court will not speculate as to the reasons behind them.[10] The Court will, however, document the time line of

---

7. As an example, both parties cite statements in CBIZ's 1998 10–K to support their claims.

8. Barring extraordinary circumstances, orders of consolidation are not appealable under 28 U.S.C. § 1291. See *In re Master Key Antitrust Litigation,* 528 F.2d 5 (2d Cir.1975).

9. The *Business Wire* is a well established mechanism for meeting the statutory notice requirements of the Reform Act. *Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 62–64 (D.Mass.1996).

10. Nor will the Court speculate as to why counsel chose not to inform the Court of these notices at the time of the consolidation hearing. The

these notices for purposes of building the record. The first notice was published on the same day the Korn group filed their first complaint (February 4, 2000). The Korn complaint was filed at 9:16 a.m., and counsel's notice followed at 3:07 p.m. The second notice, indicating that the amended complaint had been filed, came three days after the Korn group's original complaint (February 7, 2000), and two days prior to the second Korn complaint (February 9, 2000). Each of the Korn group's complaints sought to represent shareholders from March 4, 1999, to January 28, 2000.[11] Similarly, each of the notices stated that counsel sought plaintiffs purchasing shares between November 9, 1999, and January 28, 2000.

The Dewlow group's relatively small financial stake in this action combined with the puzzling facts described above make it clear that it is not the most adequate lead plaintiff group. The Reform Act's presumption in favor of the plaintiff with the largest financial interest obviously cuts against the Dewlow group. Further, counsel's flip-flop with regard to amending the complaint leaves the Court in the unsavory position of contradicting the letter and spirit of the Reform Act to solve a class period problem of counsel's own making.[12] Thus, both the Reform Act and equitable considerations dictate that the Court *DENY* the Dewlow group's motion for lead counsel.

## 2. The Korn Group

■ Unlike the Dewlow group, the Korn group seeks to represent *both* class periods as lead counsel. Scott Korn, the proposed lead plaintiff, claims losses in excess of $406,439.[13] (Aff. of in Supp. (Doc. 32) Ex. C.) On a total-loss basis, Mr. Korn's financial stake is not the largest among the competing plaintiffs. His losses, while substantial, fail to compete with the Marsh group.[14] Nonetheless, counsel for Korn argue that Marsh's losses are irrelevant, because "[p]laintiff Korn is not competing with any other movant to lead a unified class in the Consolidated Action." (Korn Reply (Doc. 38) at 4 n. 3.) The Court rejects the notion—given the deluge of paper filed on this issue—that Korn (or any other plaintiff group) is not competing for lead plaintiff. Nor will the Court allow Korn to sidestep the presumptions of the Reform Act simply by creating a class where he is the largest shareholder.[15]

In a strategy similar to the Dewlow group, Korn is simply defining the terms of the class to meet his needs. Counsel reassuringly states that "the Court need not engage in any elaborate analysis of competing financial interest" to determine the lead plaintiff. (Korn Reply (Doc. 38) at 4 n. 3.) Without a doubt, the Court agrees. Even the most numerophobic attorney can surmise that Mr. Korn's $406,439 stake in the case is far less

---

Court, however, may order counsel to show cause as to reasons behind these events should it become necessary.

11. Counsel for Dewlow contend that they represent *shareholders with substantial losses in this class period as well*. In a footnote, counsel says they "represent many shareholders in the Subsequent Class Period, whose total losses equal $1,155, 757.21." (Dewlow Response (Doc. 35) at 7, n. 11.) These shareholders support the Marsh/Dewlow co-lead plaintiffs. These facts beg the question of why counsel would decline to amend the complaint if they represented such a large group of shareholders in the second class. *It also makes it difficult for the Court to accept counsel's position against moving forward with one consolidated case having one lead plaintiff group*. If counsel can fluidly represent plaintiffs in both class periods, why is the Court being asked to rigidly view the class periods for the purposes of appointing a lead plaintiff?

12. Counsel appears to be arguing that these actions cannot move forward in a consolidated

fashion without co-lead plaintiffs. Yet the Dewlow group fails to meet the requirements of the Reform Act. Had counsel simply amended their complaint to reflect all the plaintiffs they represent, the Court and the parties might have avoided this delay in appointing lead counsel.

13. The Court is only considering Scott Korn's losses. Although counsel for the Korn group creates a CBIZ Lead Plaintiffs Group, these individuals are not considered seeking appointment as lead plaintiff.

14. The Marsh group has losses exceeding $1.3 million.

15. Interestingly, this is the converse of Dewlow's strategy. Where Dewlow defined a small subset to avoid other would-be lead plaintiffs, Korn expanded the class to a superset to avoid competing plaintiffs. It follows that the Court rejects both groups' attempt to overcome the presumption in favor of plaintiff with the largest financial interest, Marsh.

than Mr. Marsh's $956,269 in losses. Nonetheless, Korn's counsel insists that he is the largest, and only, stakeholder seeking a unified class. Unfortunately for Korn, Mr. Marsh also falls into that category. First, the Marsh group's memoranda ask, as an alternative to Marsh/Dewlow proposal, that it be appointed as lead plaintiff for a unified class. Also, there is nothing unique about Korn that enables him to serve the entire class. For all intents and purposes, the Marsh group could make the same argument that the Korn group makes. The Court finds the only difference between the Marsh and Korn groups to be the large disparity in financial interest. For this reason alone, the Korn group fails to emerge as the most adequate plaintiff. Therefore, the Court *DENIES* the Korn group's motion for lead counsel.

## 3. The Marsh Group

■ As mentioned above, the Marsh group has a larger financial interest in this matter than any other group seeking appointment as lead counsel. The group consists of two lead plaintiffs, Joe Marsh and Lee Marshall. Their total financial stake in this litigation tops $1.3 million.[16] In accord with the Reform Act, the Marsh group is presumptively the most adequate plaintiff to this action. The lead plaintiff analysis, however, does not end once the largest stakeholder is determined. The Reform Act requires that the lead plaintiff also satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure.[17] Thus, to approve the Marsh group as lead plaintiff, the Court must

**16.** Joe Marsh and Lee Marshall claim losses of $956,269.90 and $357,677.50 respectively.

**17.** Federal Rule 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties fairly and adequately protect the interests of the class.
Fed.R.Civ.P. 23(a). In determining the lead plaintiff, the third and fourth prong are the most crucial. *In re Telxon Corp. Secs. Litig.,* 67 F.Supp.2d 803, 808 n. 10 (N.D.Ohio 1999)

find that it satisfies Rule 23's *typicality* and *adequacy* requirements.

At this time, the Marsh group fails to satisfy·the requirements of Rule 23(a). Although the Marsh group states in its opening memorandum that they meet the Rule 23 standard, they take a different tack in later filed documents.[18] Specifically, the Court is troubled by the Marsh group's statement "that class certification of claims relating to the earlier period will be on *more solid footing* if there is a class representative who purchased [CBIZ] securities during [the earlier class period]." (Marsh Resp. (Doc. 39) at 5.) From this statement, the Court can infer that appointing the Marsh group as the sole lead plaintiff places class certification on *unstable footing.*

Even assuming that the Marsh group is the best choice for lead plaintiff, the Court cannot in good conscience appoint a lead plaintiff group that, by its own admission, jeopardizes the finality of class certification. Not only would this contravene the letter of the Reform Act's lead plaintiff requirements (must comply with Rule 23), but it would frustrate the purpose behind certifying a class.[19] Therefore, this Court is left with no choice but *DENY* the Marsh group's motion for appointment as lead plaintiff at this time.

## 4. The Marsh/Dewlow Co–Lead Plaintiff Group

■ Both the Marsh group and the Dewlow group propose a fourth option for appointing lead plaintiff—the Marsh/Dewlow co-lead plaintiff group. While this proposal

**18.** The Court is certainly aware that arguing alternative positions does not preclude it from choosing from one of several options presented. In this matter, however, the combination of the Dewlow group's insistence that the "original" class is not adequately represented and Marsh's apparent echoing of that sentiment leads the Court to conclude that the Rule 23 considerations are not sufficiently resolved to move forward.

**19.** "Modern plaintiff class actions follow the same goals, permitting litigation of a suit involving common questions when there are too many plaintiffs for proper joinder. Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

seems to solve the certification problem highlighted in Marsh's memorandum, it fails to live up to recent cases interpreting the Reform Act. A strong line of precedent interprets the Reform Act to preclude unrelated groups of plaintiffs from serving as lead plaintiff.[20] One of the most stringent cases in this vein issued from this bench in 1999. See *In re Telxon Corp. Secs. Litig.*, 67 F.Supp.2d 803 (N.D.Ohio 1999) (J. O'Malley). In *Telxon*, the Court not only rejected a loose amalgam of plaintiffs who sought lead plaintiff status, but went so far as to reject a group of three plaintiffs who lacked *some* prior relationship.[21] *In re Telxon*, 67 F.Supp.2d at 823 (allowing two brothers to serve as lead plaintiff, while denying a third plaintiff who lacked a pre-existing relationship with the brothers).[22] *Telxon* and its ilk

have a singular purpose in limiting the size and composition of plaintiff groups—giving interested shareholders, not counsel, control of the litigation.[23]

In the instant case, the Marsh/Dewlow group suffers from the same agency costs targeted by the *Telxon* decision.[24] Put another way, increasing the number of lead plaintiffs does nothing to further the goal of giving control to the litigants in this case. While the Marsh group's large financial interest and prior relationship comport well with the Reform Act, the addition of the Dewlow group would only dilute the lead plaintiff's ability to supervise this action.[25] Unlike the Marsh plaintiffs, the Dewlow group is comprised of unrelated shareholders assembled because they suffered higher relative losses than counsel's other clients.[26]

---

**20.** See, e.g., *Sakhrani v. Brightpoint, Inc.*, 78 F.Supp.2d 845, 853 (S.D.Ind.1999) ("This court agrees that selecting as 'lead plaintiff' a large group of investors who have the largest aggregate losses but who have nothing in common with one another beyond their investment is not an appropriate interpretation of the term 'group' in the PSLRA."); *Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146, 1154 (N.D.Cal.1999) ("the lead plaintiff must be an individual person or entity, or at most, a close-knit 'group of persons' "); *In re Donnkenny*, 171 F.R.D. at 157–58 (rejecting proposal that two unrelated institutional investors and four individual investors be appointed as lead plaintiffs).

**21.** The Court is well aware that a competing line of cases exists. See, e.g., *In re Baan Co. Secs. Lit.*, 186 F.R.D. 214, 217 (D.D.C.1999) ("The Lead Plaintiff decision should be made under a rule of reason but in most cases three should be the initial target, with five or six as the upper limit."); *In re Party City Secs. Lit.*, 189 F.R.D. 91, 114 (D.N.J.1999) (appointing institutional investor and individual investor as lead plaintiffs); *In re Nice Sys. Secs. Lit.*, 188 F.R.D. 206, 220–21 (D.N.J.1999) (appointing group of five individuals as lead plaintiff); *In re Oxford Health Plans, Inc., Secs. Lit.*, 182 F.R.D. 42, 45 (S.D.N.Y.1998) (appointing two institutional investors and group of three large individual investors as "co-lead plaintiffs"); *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 412 (D.Minn.1998) (appointing group of six individual investors as lead plaintiff); *Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 64–65 (D.Mass.1996) (appointing group of three individuals as lead plaintiff).

**22.** The Court has no intention of setting a hard and fast rule with regard to [1] the size of lead plaintiff groups, or [2] the type of relationship necessary to satisfy the Reform Act.

**23.** See, e.g., *In re Party City Secs. Lit.*, 189 F.R.D. 91, 114 (D.N.J.1999) ("where the interests of proposed lead plaintiffs are aligned, concerns regarding the division of authority and dilution of control are not paramount").

**24.** As Judge O'Malley wrote:

The larger the group, the less incentive any single member of the group—and certainly the group as a whole—will have to exercise any supervision or control over the litigation. In the case of a single plaintiff, the agency costs are those costs associated with the monitoring of and communication with the plaintiff's attorney by the individual plaintiff. Where more than one person is involved—whether it be in the context of a "group of persons" seeking to serve as lead plaintiff, or in the context of an attempt by various person to become *co-lead plaintiffs*—there is an additional cost associated with intragroup communication and monitoring. The greater the number of persons comprising the group the more difficult it is for those persons to communicate with each other, and to speak with a single coherent voice when making decisions about the conduct of the litigation, or, more precisely, the conduct of the attorney or attorneys in prosecuting the litigation. With the lead plaintiff group splintered and with no authoritative voice with which to exercise control over counsel, counsel is no more effectively controlled than in the pre-PSLRA era.

*In re Telxon*, 67 F.Supp.2d at 815–816.

**25.** Joe Marsh and Lee Marshall had been business partners for over fifteen years.

**26.** The relatively small losses in the Dewlow group suggest that they would be less engaged in the litigation than the Marsh plaintiffs.

(Decl. Steven Cauley (Doc. 18) Ex. B.) Finally, there is no relationship between the Dewlow and Marsh plaintiffs that would enhance efficient supervision of this matter. Therefore, the Court declines the opportunity to create a Marsh/Dewlow co-lead plaintiff structure.

Lastly, it is worth noting that the Court finds no particular benefit to appointing four law firms as co-lead and co-liaison counsel. As one court aptly noted, "[t]he potential for duplicative services and the concomitant increase in attorneys' fees works against the approval of multiple lead counsel." *In re Milestone Sci. Sec. Litig.*, 183 F.R.D. 404, 418 (D.N.J.1998). The Court cannot emphasize enough its strong desire to reduce the cost of this litigation to a level which reflects the intent of the Reform Act. Because no lead plaintiff will be appointed at this time, the Court encourages counsel to confer with each other in an effort to propose a lead and liaison counsel structure more suited to these goals.

## III. Conclusion

Simply put, the options presented for lead plaintiff leave the Court between the proverbial rock and hard place. Given the choice between appointing a lead plaintiff that jeopardizes the finality of class certification, and appointing a co-lead plaintiff structure that thwarts the goals of the Reform Act, the Court chooses "none of the above." Accordingly, all motions for appointment as lead plaintiff are hereby *DENIED*. Absent *a resolution by plaintiffs and their chosen counsel,* the Court will hold a hearing to resolve the matter of lead plaintiff and lead counsel.

IT IS SO ORDERED.